EPISCOPAL SCHOOL OF CINCINNATI, APPELLEE,
*v.* LEVIN, TAX COMMR., APPELLANT.

[Cite as *Episcopal School of Cincinnati v. Levin,*
117 Ohio St.3d 412, 2008-Ohio-939.]

(No. 2007–0126—Submitted December 11, 2007—Decided March 12, 2008.)

LUNDBERG STRATTON, J.

{¶ 1} Prior Ohio Supreme Court cases have recognized that a property owner may obtain a "prospective use" exemption for real property during a year in which the owner is developing the property for the exempt use. This case addresses the situation in which the exempt use never materializes, and it raises two issues. First, we must decide whether the applicant's ultimate failure to accomplish its exempt purpose should lead to a denial of a prospective-use exemption for a prior tax year. Second, we must decide whether the reasonable

prospect of exempt use must exist not only on the tax lien date but also on the date the exemption application is filed.

{¶ 2} The Board of Tax Appeals ("BTA") held that the exemption is available if the standard for prospective use is satisfied on January 1, the tax lien date, of the tax year. The Tax Commissioner contends that to qualify for the exemption, the applicant must continue its expectation of developing the exempt use of the property on the date of application. We agree with the BTA, and we therefore affirm.

## I

{¶ 3} On December 21, 2001, Episcopal School of Cincinnati ("ESC") filed its application to exempt the property at issue from taxation. ESC is a nonprofit corporation formed by the Episcopal Diocese of Southern Ohio, with the diocese as its sole member and with a board of trustees, most appointed by the bishop, that exercised management functions. ESC qualified for tax-exempt status under Section 501(c)(3) of the Internal Revenue Code as part of the Episcopal Diocese. Exemption of the property was sought under R.C. 5709.07 (public-schoolhouse exemption) and under R.C. 5709.12 and 5709.121 (charitable-use exemption). The application recited that the property was acquired on November 29, 2000, from the Cincinnati Museum Center.

{¶ 4} ESC arose from the bishop's vision of creating an Episcopal school in Cincinnati that would be located near the city center, would be religiously based, and would serve inner-city and other children in greater Cincinnati. The property was the former Natural History Museum on Gilbert Avenue, which ESC acquired in November 2000 in a complex transaction involving the acquisition and exchange of another building. ESC ultimately sold the property on November 15, 2002, without ever having opened the school on the property. The Tax Commissioner issued his final determination on February 10, 2004, and denied the exemption on the ground that the school had never opened at the location. ESC then appealed to the BTA.

{¶ 5} At the BTA, ESC presented two witnesses and eight exhibits in support of its claim of exemption. The evidence documented ongoing efforts to establish the school from 1999 through 2001. Among those efforts were various financial arrangements to acquire and renovate the property, the hiring of a coordinator and a curricular staff for the school, and the filing of certification documents with the Ohio Department of Education. ESC announced in September 2000 that the school would open one year later. As of the tax lien date, January 1, 2001, the project coordinator was on duty, the school principal had been hired and would later review teacher applications, and financing for the renovation of the building was underway, including a multimillion-dollar bond issue.

{¶ 6} ESC's principal witness, a diocesan official, testified that in February 2001, the project coordinator "moved out of the city quite suddenly" when it began to appear that he had built "a financial house of cards" by telling the trustees one story and the diocese another. By April 2001, the situation "hit the fan," and the "deal had fallen apart" financially. In particular, the refusal of underwriters to proceed with the bond issue made it impossible to complete the renovation. Minutes of the meetings of the ESC board of trustees show strong intent to proceed with the project as of January 2001, but the March minutes raise the question whether the board ought to consider a different site for the school, and the April 2001 minutes show discussion of a possible liquidation of assets. In June 2001, the school principal left.

{¶ 7} The BTA found that by the time the exemption application was filed in December 2001, ESC "had already begun considering the possibility of starting a school in another building" and had "effectively * * * abandoned" the notion of using the property. On the other hand, no use of the property other than the proposed exempt use was ever contemplated. Moreover, at the time the application was filed, the bishop still wanted to develop the school, even at the same site, if a way could be found to do so. But as noted, ESC did finally sell the property to a for-profit entity in November 2002.

{¶ 8} The BTA reversed the Tax Commissioner's denial of the exemption, in spite of finding that the plan to use the site for the school had "effectively been abandoned" at the time the application was filed. The BTA held that ESC was entitled to a prospective-use exemption for 2001 because of its ongoing efforts to establish the school as of the tax lien date, January 1, 2001. The Tax Commissioner then appealed the BTA's decision to this court.

## II

{¶ 9} ESC's application seeks to exempt the property for tax year 2001 under two statutory exemptions. The application noted that "[a]lthough (as of the date of this application) the school is not yet open for enrollment, the applicant has been actively planning and working toward the use of the property for the above purposes." Thus, ESC was explicitly seeking exemption under the prospective-use doctrine, which provides generally as follows:

{¶ 10} "Where an entity, which under the law is entitled to have its property exempted from taxation, acquires real property with the intention of devoting it to a use exempting it from taxation, such property is entitled to be exempted from taxation, as long as it is not devoted to a nonexempt or commercial use, even though actual physical use of the property for the exempt purpose has not yet begun." *Carney v. Cleveland City School Dist. Public Library* (1959), 169 Ohio St. 65, 8 O.O.2d 33, 157 N.E.2d 311, paragraph one of the syllabus.

{¶ 11} As the BTA correctly found, the elements articulated in the *Carney* syllabus are present in this case. The property, formerly a natural history museum, was acquired for the express purpose of being developed into a school that would qualify for exemption as a public schoolhouse under R.C. 5709.07 or as a charitable use of property under R.C. 5709.12 and 5709.121. The Episcopal diocese and ESC's trustees had taken substantial steps to secure financing to renovate the building, had hired a principal, were reviewing teacher applications, and had announced the school's opening.

{¶ 12} The Tax Commissioner concedes that measures had been taken to establish a school and that they might have qualified ESC for exemption under *Carney* as of January 1, 2001, which is the tax lien date for the 2001 tax year. The difficulties in converting the property for use as a school, which ultimately proved insuperable, began in early 2001.

{¶ 13} But the Tax Commissioner nonetheless argues that an exemption for prospective use should be denied. In his final determination, he stated the grounds for denial as follows:

{¶ 14} "In reviewing this application, the passing of time has proven to be a benefit because the facts available to us now are more complete and accurate than those available at the time this application was filed. Since it has been established that the applicant's intention did not result in an exempt use of the property, then neither the actual nor the prospective use test have been satisfied, and the requirements of R.C. 5709.07 have not been satisfied."

{¶ 15} Because this conclusion is at odds with our case law, we reject it.

{¶ 16} In *Lake Cty. Bd. of Commrs. v. Supanick* (1972), 32 Ohio St.2d 45, 61 O.O.2d 279, 289 N.E.2d 902, we addressed an application under R.C. 5709.08, which provides exempt status for "public property used exclusively for a public purpose." In *Supanick,* the county commissioners had purchased a parcel for the express purpose of establishing a hospital on the site. Subsequently, two bond issues to finance the hospital were defeated. The BTA denied the exemption because the exempt use had not materialized, and we reversed. We found that the general prospective-use test applied to the year at issue, and we held that "such property is entitled to be exempted from taxation until such time as the ultimate purpose has been abandoned, or efforts to realize the ultimate purpose have ceased, or the property has been put to a nonpublic use." *Supanick,* syllabus.

{¶ 17} In the present case, all are agreed that ESC pursued exempt use of the property as of the beginning of tax year 2001. To the extent that the situation entitles ESC to a prospective-use exemption, *Supanick* explicitly holds that the exemption for year 2001 is not lost if the exempt use has not materialized by the time the exemption application is considered.

{¶ 18} This case goes one step beyond *Supanick:* the Tax Commissioner knew at the time he issued his final determination that in the subsequent year 2002, the project of developing the property into a school had been completely abandoned, that the property had been sold to a for-profit entity in November 2002, and that accordingly, the exempt use of the property would *never* materialize. In spite of this distinction, however, we think that the core principle of *Supanick* applies here: events in subsequent years do not retroactively divest an owner of an exemption to which it is entitled by virtue of the reasonable prospect of exempt use during that prior year. Indeed, the Eighth District Court of Appeals has applied *Supanick* in a situation in which the exempt use never materialized and ultimately had to be abandoned. *Community Temple v. Voinovich* (Apr. 8, 1976), Cuyahoga App. No. 35395, 1976 WL 191189. We conclude that the appellate court correctly applied the law in that case.

{¶ 19} The Tax Commissioner argues that *Supanick* is not apposite, because that case involved property owned by a governmental entity rather than a private entity. The standard for private entities, according to the Tax Commissioner, is set forth in *Holy Trinity Protestant Episcopal Church v. Bowers* (1961), 172 Ohio St. 103, 15 O.O.2d 173, 173 N.E.2d 682, and differs from the standard for governmental property. But the *Holy Trinity* decision itself persuades us that the Tax Commissioner is mistaken. *Holy Trinity* explicitly relies upon the very syllabus paragraph of *Carney* that we quoted above, and *Carney* was a case involving governmental ownership. Moreover, *Holy Trinity* expressly states that the discussion in *Carney* concerning "the exempt status of public property" is "equally applicable to a nongovernmental entity." Id. at 107, 15 O.O.2d 173, 173 N.E.2d 682. Indeed, we observed in *Holy Trinity* that "a private religious institution would be beset with the same problems as, if not greater than, those confronting a governmental entity" in developing an exempt use of property. Id.

{¶ 20} There is no legal reason to apply a different test to private property that is held with the prospect of exempt use. Nor do we see any reason to draw such a distinction under the circumstances of this case. ESC was formed to acquire property and start a school, and the funds that it generated for those purposes were earmarked at all times for a purpose that the statutes regard as exempt. We see no more reason to inflict a retrospective tax burden on a private entity that fails to realize its tax-exempt project than we do on a governmental agency.

{¶ 21} Accordingly, the Tax Commissioner's final determination erred by denying a prospective-use exemption for 2001 based upon the final abandonment of the use and the sale of the property in 2002, and the BTA correctly reversed that determination.

### III

{¶ 22} At the BTA and now before this court, the Tax Commissioner presents a modified version of the theory that he relied upon in the final determination.

Citing *Holy Trinity*, the Tax Commissioner focuses on specific language and concludes that the case imposes an additional requirement when the exempt use is not yet achieved. *Holy Trinity* states that "it must be shown that the entity, at the time the application for exemption is made, is actively working toward the actual use for the public benefit." *Holy Trinity*, 172 Ohio St. at 107, 15 O.O.2d 173, 173 N.E.2d 682. The Tax Commissioner emphasizes the reference to active efforts "at the time the application for exemption was made" and asserts that *Holy Trinity* requires that the prospect of exempt use still exist not only on the tax lien date but also on the date the application is filed. We disagree.

{¶ 23} We regard as settled the general proposition that the taxable or exempt status of property should be determined as of the tax lien date, which is January 1 of whatever tax year is at issue. See R.C. 323.11 (lien attaches on January 1 to "all property subject to" the "taxes levied for all purposes on the real and public utility tax list and duplicate for each year"); *Christian Benevolent Assn. of Greater Cincinnati v. Limbach* (1994), 69 Ohio St.3d 296, 297, 631 N.E.2d 1034; *Grove City v. Zaino* (Sept. 24, 2004), BTA No. 2003–K–722 at 9 (case law establishes that the "determinative date in ascertaining taxable status, as well as the value, of real property is January 1, annually, the date on which real estate taxes become a lien against such property"). One implication of this proposition as consistently applied by the BTA is that later events during the tax year do not vitiate an exemption for that tax year if the situation on January 1 justified exempt status. See *Grove City* at 12, quoting *Chapel, Inc. v. Limbach* (Oct. 30, 1978), BTA No. 1985–F–925, at 8 (if an " 'intervening non-exempt primary use is made of the real property' " during the tax year, " 'any change in that property's tax exempt status must be determined as of January 1 of the next tax year' ").

{¶ 24} The Tax Commissioner's contention in this case directly conflicts with the consistent and well-reasoned approach taken by the BTA. That is so because the Tax Commissioner advocates a two-pronged test, in which the first prong examines the situation on January 1, and the second prong examines the situation on the later date upon which the exemption application is filed.

{¶ 25} The second prong of this proposed test would require that we also look at the prospects for exempt use as of the date of application, but we find the BTA's decision to look exclusively at the tax lien date is far more reasonable. We therefore reject the contention that a discouraging state of affairs on the day the application is filed should divest an entity of exempt status for the year.

{¶ 26} In particular, the Tax Commissioner's proposal could lead to absurd results. Here, for example, when the application was filed, the diocese and ESC were still interested in establishing the school if the means could be found to do so. One of the diocesan employees testified that had the bonds been issued to finance the school, the project would have gone forward. Another employee, the

financial officer, testified that as of December 2001, when the application was filed, the bishop still wanted to go forward with the project and "would have gone ahead if he would have seen a way for it to have been happening." Given this state of the record, if three or four wealthy donors had stepped forward in January or February of 2002, the school could have eventually opened. Yet the Tax Commissioner's proposed second prong of the prospective-use test would operate to deprive ESC of the exemption for the 2001 year even if the project were to come to full fruition the following year. We see no reason to impose such an arbitrary requirement.

{¶ 27} Nor do we agree with the Tax Commissioner that *Holy Trinity* dictates the two-pronged test that he proposes. The facts of *Holy Trinity* are very distinct from those of this case. In *Holy Trinity*, funds were raised over a lengthy period of time, and the church was finally constructed. The case simply did not present a situation in which the court had any need to look at the particular state of affairs on the date the exemption application was filed. Accordingly, we construe its reference to the application date as dicta that does not constitute authority for the Tax Commissioner's proposed two-pronged test.

## IV

{¶ 28} For all the reasons discussed, we conclude that an owner is entitled to an exemption for prospective use when the prospective-use standard is satisfied on the tax lien date of the tax year at issue. The BTA acted reasonably and lawfully when it reversed the Tax Commissioner's determination and granted a prospective-use exemption for tax year 2001. We therefore affirm.

Decision affirmed.

PFEIFER, O'CONNOR, O'DONNELL, and CUPP, JJ., concur.

MOYER, C.J., concurs in judgment only.

LANZINGER, J., dissents.

---

**LANZINGER, J., dissenting.**

{¶ 29} I respectfully dissent. Although tax-exempt status is determined as of the date of the lien date for the tax year, it is important to recognize that the property owner here is seeking an exemption for a *prospective* use of the property for tax year 2001. Looking at a property solely as of the date of the tax lien for the tax year relieves the applicant of the burden to show, on its date of application, the current intent to use the property for tax-exempt purposes.

{¶ 30} *Holy Trinity Protestant Episcopal Church v. Bowers* (1961), 172 Ohio St. 103, 15 O.O.2d 173, 173 N.E.2d 682, provides the answer to the question of

when the property owner must show its intent to devote the property to an exempt use.

{¶ 31} The quotation from *Holy Trinity*, truncated by the majority, deserves replication in full: "However, so far as nongovernmental entities are concerned, mere ownership, standing alone, is not sufficient to create a right to tax exemption. Such ownership must be coupled with the purpose, supported by tangible evidence, that the property will be devoted to an actual physical use for the public benefit. *The intent to use such property for an exempt purpose must be one of substance* and not a mere dream that sometime in the future, if funds can be obtained, the entity would so use such property. In other words, it must be shown that the entity, *at the time the application for exemption is made*, is actively working toward the actual use for the public benefit. Evidence that surveys have been made and plans drawn or that active fund-raising campaigns are being carried on is indicative that the exempting use will be made of the property within a reasonable time." (Emphasis added.) Id. at 107, 15 O.O.2d 173, 173 N.E.2d 682.

{¶ 32} I agree with the Tax Commissioner that the requirements of R.C. 5709.07 have not been met in this case. I would hold that a prospective use exemption from real property taxation should be granted if the applicant (1) has acquired property as of the date of the tax lien for the tax year and (2) produces evidence as of the date of its application for tax exemption that the property is intended to be devoted to an exempt use. The majority's statement that "*Supanick* explicitly holds that the exemption for year 2001 is not lost if the exempt use has not materialized by the time the exemption application is considered" is an unwarranted recasting of the syllabus, which reads: "Where a board of county commissioners acquires real property with the ultimate purpose of devoting it to a specified use which would exempt it from taxation, such property is entitled to be exempted from taxation *until such time as the ultimate purpose has been abandoned, or efforts to realize the ultimate purpose have ceased*, or the property has been put to a nonpublic use, even though actual physical use of the property for the intended exempt purpose has not yet begun." (Emphasis added.) *Lake Cty. Bd. of Commrs. v. Supanick* (1972), 32 Ohio St.2d 45, 61 O.O.2d 279, 289 N.E.2d 902. Because the BTA determined that the Episcopal School of Cincinnati had abandoned the plan to use the site for the school by the time the application was filed, the applicant was not entitled to the exemption. I would therefore reverse the decision of the Board of Tax Appeals and reinstate the Tax Commissioner's denial of a tax exemption to the Episcopal School of Cincinnati for 2001.

Frost Brown Todd, L.L.C., Joseph J. Dehner, and Samuel M. Scoggins, for appellee.

Marc Dann, Attorney General, and Janyce C. Katz, Assistant Attorney General, for appellant.